CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 18 2011

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

THOMAS W. JACKSON,                )
                                  )   Civil Action No. 7:09CV00408
        Plaintiff,                )
                                  )   **MEMORANDUM OPINION**
v.                                )
                                  )   By: Hon. Glen E. Conrad
MICHAEL FLETCHER,                 )   Chief United States District Judge
Correctional Officer,             )
                                  )
        Defendant.                )

Thomas W. Jackson, a former inmate at Botetourt Correctional Center ("Camp 25"), filed

this civil rights action under 42 U.S.C. § 1983, alleging that Michael Fletcher, a former

correctional officer at Camp 25, tortured and abused him in violation of his rights under the

Constitutions of the United States and the Commonwealth of Virginia. Jackson also asserted

supplemental state law claims of assault, battery, and intentional infliction of emotional distress.

The case is presently before the court on Fletcher's motion for summary judgment. For the

reasons that follow, the motion will be granted in part and denied in part.

### Statement of the Facts

The following facts are presented in the light most favorable to the plaintiff. See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be

construed in the light most favorable to the party opposing summary judgment).

In May of 2006, the Circuit Court of Botetourt County sentenced Jackson to a 28-month

term of imprisonment for violating the terms of his state probation. Jackson was committed to

the custody of the Virginia Department of Corrections, and in July of 2007 he was transferred to

Camp 25.

Defendant Fletcher supervised the farm crew at Camp 25, which was comprised of several inmates who performed chores on the facility's working farm. Inmates who were skilled in certain trades, such as woodworking, plumbing, painting, and welding, were selected for the farm crew.

Upon being transferred to the camp, Jackson was given the opportunity to join the farm crew, after Fletcher learned that Jackson was skilled in welding. Fletcher readily accepted the assignment to help pass the time at Camp 25.

Jackson claims that soon after he was assigned to the farm crew, Fletcher began to "torture[] and abuse[] him." (2d Am. Compl. at para. 12). The abuse is alleged to have included the following acts, which are enumerated in paragraph 12 of the second amended complaint:

(a)     Fletcher sprayed Freon on Jackson's ear and neck, causing him to suffer frostbite and resultant numbness;

(b)     Fletcher ignited firecrackers near Jackson while he was welding and working underneath a vehicle;

(c)     Fletcher put catfish bait in motor vehicles that Jackson was assigned to service;

(d)     Fletcher made crude comments about Jackson and Jackson's wife;

(e)     Fletcher repeatedly placed lit cigarettes in Jackson's pockets while he was welding, causing him to suffer burns on his body;

(f)     Fletcher placed habanero pepper juice in Jackson's welding hood, which seeped into his eyes and caused severe pain;

(g)     Fletcher repeatedly hit Jackson in the back, ribs, and head;

(h)     Fletcher forced Jackson to help him kill a hog and, during the process, wildly fired a .40 caliber firearm, nearly shooting Jackson and causing him to temporarily lose his hearing and fear for his life;

(i)     Fletcher gave Jackson chewing tobacco laced with manure, which caused him to become ill;

(j)     Fletcher threw fly trap bait on Jackson, causing him to reek from the odor of the bait;

(k)     Fletcher forced Jackson to work on a motor vehicle in the middle of a field, so that Jackson had to walk a quarter of a mile between the vehicle and the car to retrieve tools and parts needed for the job;

(l)     Fletcher used sexual and racial epithets to refer to Jackson, who is a white male;

(m)     Fletcher used a shocking device to administer an electric shock to Jackson's testicles while he was working;

(n)     Fletcher threw flammable liquids into Jackson's work area while he was welding, frightening Jackson and, at times, causing burns;

(o)     Fletcher demanded that Jackson permit him to inspect a wound on his lip, and subsequently pressed a habanero pepper into the wound, causing severe pain;

(p)     Fletcher put hot sauce in Jackson's drinking cups;

(q)     Fletcher rigged a plug on a welding machine to shock Jackson with 220 volts of electricity, causing burns to Jackson's hands;

(r)     Fletcher forced Jackson to inhale ammonia fumes;

(s)     Fletcher used feed to make cattle charge at, and frighten, Jackson;

(t)     Fletcher threatened to put Jackson "in the hole," i.e. solitary confinement, if he ever reported how he was being treated; and

(u)     Fletcher had Jackson placed "in the hole" to punish him for reporting the mistreatment inflicted by Jackson.

The above listed acts of abuse purportedly commenced in the fall of 2007. In December of 2007 or January of 2008, Fletcher was transferred away from the farm crew after the Office of Inspector General for the Department of Corrections began investigating another inmate's

complaint of corruption and pilferage by correctional officers at Camp 25. Fletcher resigned from the Department of Corrections in late 2008.

According to Jackson's deposition testimony, Fletcher's actions caused scarring to his buttocks from cigarette burns, burning in his eyes and lips, pain to areas of his body where he was hit and shocked by Fletcher, and emotional and mental trauma from Fletcher's overall treatment of him. It is undisputed that Jackson never asked to return to the general population at Camp 25 while being supervised by Fletcher, and that he never used the facility's grievance procedures to complain about Fletcher. However, Jackson maintains that he endured the treatment from Fletcher because he was afraid that Fletcher would retaliate if Jackson reported the mistreatment.

### Procedural History

On October 7, 2009, Jackson filed the instant action against Fletcher, the Commonwealth of Virginia, and the Department of Corrections, asserting claims under § 1983 and Virginia law. Jackson later filed an amended complaint, which added Gene Johnson, the Director of the Virginia Department of Corrections, and J.D. Terry, the Warden at Camp 25, as defendants.

On May 14, 2010, Jackson filed a second amended complaint, which named as defendants only Fletcher and Warden Terry. Fletcher and Terry filed answers to the second amended complaint and discovery ensued. At the close of discovery, Jackson voluntarily dismissed his claims against Terry, leaving only his claims against Fletcher.

Jackson's claims against Fletcher are set forth in Counts One, Two, and Three of the second amended complaint. In Count One, Jackson asserts that Fletcher's conduct constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States

4

Constitution and Article I, § 9 of the Constitution of Virginia, and resulted in the denial of due process in violation of the Fourteenth Amendment to the United States Constitution. In Count Two, Jackson asserts claims of assault and battery under Virginia law. In Count Three, Jackson seeks to recover for intentional infliction of emotional distress.

The case is now before the court on Fletcher's motion for summary judgment. The court held a hearing on the motion on January 6, 2011. The motion is fully briefed and ripe for review.

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, however, the burden shifts to the non-moving party to show that such an issue does, in fact, exist. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The non-moving party must set forth more than a "mere . . . scintilla of evidence" to forestall summary judgment. Anderson, 477 U.S. at 252.

"[U]nsupported speculation . . . is not sufficient to defeat a summary judgment motion." Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-412 (4th Cir. 1986).

## Discussion

### I.    Claims under § 1983

Jackson filed suit under 42 U.S.C. § 1983, which imposes civil liability for federal constitutional violations committed under color of state law.  As previously stated, Jackson claims that Fletcher's conduct violated his Eighth Amendment right to be free from cruel and unusual punishment and resulted in the denial of due process in violation of the Fourteenth Amendment.

#### A.    Claims under the Eighth Amendment

The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments."[1] U.S. Const. amend. VIII.  In the prison context, the amendment "not only outlaws excessive sentences but also protects inmates from inhumane treatment . . . ." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).  To determine whether a prison official has violated the Eighth Amendment, courts must analyze both subjective and objective components. Id.  Specifically, this analysis requires "inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation or injury inflicted on the inmate was sufficiently serious (objective component)." Id.  "These requirements spring from the test of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be

---

[1] Because the parallel provision of the Constitution of Virginia, Article I, § 9, provides no greater protection to inmates than the cruel and unusual punishment clause of the Eighth Amendment, the court will not separately address Jackson's state constitutional claims.

called 'cruel and unusual.'" Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (citing Wilson v. Seiter, 501 U.S. 294, 298-300 (1991)).

The specific showing necessary to establish each component "varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992). For instance, when an inmate challenges his conditions of confinement, he "must (1) establish that prison officials acted with 'deliberate indifference' and (2) prove extreme deprivations of basic human needs or 'serious or significant' pain or injury." Smith v. Ozmint, 578 F.3d 246, 254 (4th Cir. 2009) (citing Williams, 77 F.3d at 761). Deliberate indifference requires the inmate to produce evidence that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. See Farmer v. Brennan, 511 U.S. 825, 837 (1994).

When an inmate claims, as Jackson does here, that prison officials used excessive force in violation of the Eighth Amendment, the subjective component is more demanding. See Williams, 77 F.3d at 761. The inmate "must demonstrate that officials applied force 'maliciously and sadistically for the very purpose of causing harm,'" Williams, 77 F.3d at 761 (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)), rather than as part of "a good faith effort to maintain or restore discipline," Whitley, 475 U.S. at 320. On the other hand, "the objective component of an excessive force claim is less demanding than that necessary for conditions-of-confinement or inadequate medical care claims." Williams, 77 F.3d at 761 (emphasis in original). As the United States Supreme Court explained in Hudson v. McMillian:

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic and inhuman, inflicting less than some arbitrary quantity of injury.

7

Hudson, 503 U.S. at 9.

"This is not to say that the 'absence of serious injury' is irrelevant to the Eighth

Amendment inquiry." Wilkins v. Gaddy, ___ U.S. ___, 130 S. Ct. 1175, 1778 (2010). To the

contrary, the extent of the injury may suggest that "'the use of force could plausibly have been

thought necessary' in a particular situation" or "provide some indication of the amount of force

applied." Id. (quoting Hudson, 503 U.S. at 7). For instance, "[a]n inmate who complains of a

[mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid

excessive force claim." Wilkins, 130 S. Ct. at 1178 (quoting Hudson, 503 U.S. at 9). However,

as Wilkins recently made clear, it is the nature of the force "that ultimately counts" and provides

the "core judicial inquiry" in an excessive force case. Id. at 1179. Specifically, courts must

consider "whether [the force] was nontrivial and 'was applied maliciously and sadistically to

cause harm.'" Id. (quoting Hudson, 503 U.S. at 7).[2]

### 1.    The merits of Jackson's Eighth Amendment claims

Having reviewed the record and the applicable case law, the court concludes that

Fletcher's motion for summary judgment on the merits of Jackson's Eighth Amendment claims

must be granted in part and denied in part.

---

[2] As will be discussed infra, Wilkins abrogated the United States Court of Appeals for the Fourth Circuit's decision in Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994) (en banc), in which the Fourth Circuit held that "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis." Norman, 25 F.3d at 1263. The Wilkins Court held that "[t]he Fourth Circuit's strained reading of [Hudson v. McMillian was] not defensible, and that Hudson "did not, as the Fourth Circuit would have it, merely serve to lower the injury threshold for excessive force claims from 'significant' to 'non-de minimis'--whatever those ill-defined terms might mean." Wilkins, 130 S. Ct. at 1000.

First, the court agrees with Fletcher that the one-time incidents involving catfish bait and fly trap bait (paragraphs 12(c) and 12(j) of the second amended complaint), which allegedly caused Jackson to "reek from the odor" (Jackson Dep. at 124), do not make out a claim of constitutional dimension. There is no allegation that either incident involved any injury or pain, and Jackson has otherwise failed to proffer any evidence from which a reasonable jury could find that the incidents were "nontrivial." Wilkins, 130 S. Ct. at 1179.

Along the same lines, the court concludes that Fletcher is entitled to summary judgment with respect to the claims involving alleged threats and/or verbal harassment (paragraphs 12(d), 12(l), and 12(t) of the second amended complaint). As Fletcher points out, it is well-established that "[m]ere threats or verbal abuse of inmates by prison officials, without more, do not state a cognizable claim under the Eighth Amendment." Henslee v. Lewis, 153 F. App'x 178, 180 (4th Cir. 2005) (citing Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979)).

While Jackson allegedly suffered injury and was forced to go to the hospital following the pepper juice incident described in paragraph 12(f) of the second amended complaint, the record reveals that such claim is barred by the two-year statute of limitations applicable to § 1983 claims. See Harvey v. Horan, 278 F.3d 370, 384 (4th Cir. 2002); see also Va. Code § 8.01-243. Jackson obtained medical treatment at the Camp 25 infirmary and Carilion Roanoke Memorial Hospital on September 23, 2007 for a "welding flash."[3] He did not file the instant action until October 7, 2009, more than two years after the pepper juice incident allegedly occurred. Consequently, Fletcher is entitled to summary judgment on the claims arising from that incident.

---

[3] During his deposition, Jackson testified that he visited the hospital once following the incident, and that he attributed the injury to a "welding flash" because he was afraid to reveal the pepper juice prank to medical personnel. (Jackson Dep. at 64).

The court further concludes that Fletcher is entitled to summary judgment with respect to the incident involving chewing tobacco laced with manure (paragraph 12(i) of the second amended complaint). During his deposition, Jackson testified that he randomly found a bag of chewing tobacco that belonged to someone else, and that he "thought maybe [he] was going to sneak [him] a little chew of tobacco." (Jackson Dep. at 74). As soon as he began chewing the tobacco, he realized that it contained manure. Although Jackson testified that he later observed Fletcher laughing at him, he acknowledged that he did not know who the chewing tobacco belonged to, and that he could not testify, for certain, that it was Fletcher who placed the manure in it. Fletcher has specifically denied having anything to do with the incident, and Jackson's speculation to the contrary is insufficient to survive summary judgment. See Ash, 800 F.2d at 411-412.

The court also concludes that Fletcher is entitled to summary judgment with respect to the claim arising from the incident described in paragraph 12(k) of the second amended complaint, in which Jackson alleges that, on one occasion, he was required to service a vehicle that was located approximately one-fourth of a mile from the garage where Jackson normally worked. During his deposition, Jackson testified that Fletcher moved the vehicle on which he was working in order to separate him from another inmate, because the two inmates had been talking to each other in the automotive shop. Jackson further admitted during his deposition that, following the enforced separation, he completed his assignments. In light of Jackson's own testimony, the court agrees with Fletcher that this disciplinary measure cannot sustain a claim under the Eighth Amendment. See Howard v. Ray, 2010 U.S. Dist. LEXIS 97698, at *8 (W.D. Va. Sept. 17, 2010) ("Plaintiff must prove that, subjectively, the force was applied 'maliciously and sadistically for the very

purpose of causing harm,' rather than 'in a good faith effort to maintain or restore discipline.'") (quoting Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998)).

The court also agrees with Fletcher that he is entitled to summary judgment on the plaintiff's claim that Fletcher put hot sauce on the rims of the plaintiff's drinking cups (paragraph 12(p) of the second amended complaint). While the court acknowledges that the hot sauce may have caused temporary discomfort, the court is unable to conclude that such misconduct is sufficient to state a claim of constitutional proportion. Indeed, Fletcher acknowledged during his deposition that "that part" of Fletcher's conduct was more akin to "horseplay." (Jackson Dep. at 139).

Along the same lines, the court concludes that Fletcher is entitled to summary judgment with respect to the charging cattle allegation contained in paragraph 12(s) of the amended complaint. During his deposition, Jackson testified that, on one occasion, Fletcher directed him to feed the cattle on the Camp 25 farm, and that when the cattle rushed toward the feed, Fletcher began to drive off and Jackson was forced to hop onto the back of the truck. While Fletcher's conduct may have been irritating or obnoxious, there is no evidence that the incident caused any pain or injury, and the court agrees with Fletcher that no reasonable jury could find that it constituted excessive force in violation of the Eighth Amendment.

Finally, the court concludes that Fletcher is entitled to summary judgment with respect to Jackson's claim that he was placed "in the hole" for seven hours after he complained about Fletcher's mistreatment (paragraph 12(u) of the second amended complaint). During his deposition, Jackson acknowledged that he received the same meals during his seven-hour placement in solitary confinement that he would have eaten had he been working on the farm

11

crew, and that he had access to a bed and a toilet. While Jackson's freedom of movement may have been more restricted during that seven-hour period, the court agrees with Fletcher that Jackson has failed to establish that his temporary placement in solitary confinement constituted cruel and unusual punishment.

While the foregoing claims are insufficient to survive Fletcher's motion for summary judgment, the court is constrained to conclude that Fletcher is not entitled to summary judgment on the merits of the remaining claims contained in paragraphs 12(a), 12(b), 12(e), 12(g), 12(h), 12(m), 12(n), 12(o), 12(q), and 12(r) of the second amended complaint. In those claims, as previously summarized, Jackson alleges that Fletcher sprayed Freon on Jackson's ear and neck, causing him to suffer frostbite and resultant numbness; ignited firecrackers near Jackson while he was welding and working underneath a vehicle; repeatedly placed lit cigarettes in Jackson's pockets while he was welding, causing him to suffer burns on his body; repeatedly hit Jackson; forced Jackson to help him kill a hog and, during the process, wildly fired a .40 caliber firearm, causing Jackson to fear for his life; used a shocking device to administer an electric shock to Jackson's testicles while he was working; threw flammable liquids into Jackson's work area while he was welding; intentionally pressed a habanero pepper into an open wound on Jackson's lip; rigged a plug on a welding machine to shock Jackson with 220 volts of electricity; and forced Jackson to inhale ammonia fumes. Assuming the truth of Jackson's assertions, the court is convinced that a reasonable jury could find that the foregoing incidents involved force that was excessive rather than trivial, and that Fletcher acted "maliciously and sadistically for the very purpose of causing harm." Williams, 77 F.3d at 761 (internal citation omitted); see also Wilkins, 130 S. Ct. at 1179.

## 2.    Qualified immunity

Fletcher alternatively argues that even if he used excessive force against Jackson, he is entitled to qualified immunity. The defense of qualified immunity "shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Henry v. Purnell, 501 F.3d 374, 376-377 (4th Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a government official asserts this defense, the court must determine: (1) "whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right"; and (2) "'whether the right was clearly established' -- that is, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. at 377 (quoting Saucier v. Katz, 533 U.S. 194, 201-202 (2001)). The answer to both of the foregoing questions must be in the affirmative in order for a plaintiff to withstand a motion for summary judgment on qualified immunity grounds. Henry, 501 F.3d at 377.

In the present case, the court has already determined that, taking the facts in the light most favorable to Jackson, a reasonable trier of fact could conclude that the acts identified in paragraphs 12(a), 12(b), 12(e), 12(g), 12(h), 12(m), 12(n), 12(o), 12(q), and 12(r) of the second amended complaint violated the Eighth Amendment prohibition against cruel and unusual punishment. Consequently, the court must focus its attention on whether the constitutional right allegedly violated was clearly established at the time of the violation. In determining whether a right was clearly established, the key inquiry is "whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

In this case, Fletcher's assertion of qualified immunity is premised on Fourth Circuit precedent established by Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994) (en banc). In Norman, the Fourth Circuit held that "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis." Id. at 1263. After Jackson filed the instant action, the Supreme Court overruled Norman in Wilkins v. Gaddy, holding that, while the extent of an inmate's injury is relevant in assessing an excessive force claim, the "core judicial inquiry" is "the nature of the force" rather than "the extent of the injury." Wilkins, 130 S. Ct. at 1179.

Fletcher now contends that the de minimis injury doctrine, which was still good law at the time of the alleged violations in this case, should provide him the protection of qualified immunity, since "the injuries Jackson alleges . . . were at most de minimis." (Def.'s Br. in Supp. of Summ. J. at 10). For the following reasons, however, the court disagrees.

Even at the time of the alleged violations in this case, the Fourth Circuit recognized that the existence of only de minimis injuries did not necessarily serve as an absolute bar to recovery under the Eighth Amendment. Indeed, in Norman itself, the Fourth Circuit specifically acknowledged that "there may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in an impermissible infliction of pain." Norman, 25 F.3d at 1263, n.4 (citing Hudson, 503 U.S. at 9 ("diabolic" or "inhuman" physical punishment unconstitutional regardless of injury)). The Court noted that, in such circumstances, it believed that "either the force used will be 'of a sort repugnant to the conscience of mankind,'" and thus expressly outside the de minimis force

14

exception, or the pain itself will be such that it can properly be said to constitute more than de minimis injury." Id. (quoting Hudson, 503 U.S. at 10).

Two years later, in Williams v. Benjamin, 77 F.3d 756 (4th Cir. 1996), the Fourth Circuit again emphasized that the lack of physical injuries did not automatically preclude a claim of excessive force under the Eighth Amendment. Citing Norman, the Court emphasized that "[m]ankind has devised some tortures that leave no lasting physical evidence of injury," and that it had "specifically recognized that the objective component [of an excessive force claim] can be met by 'the pain itself,' even if an inmate has no 'enduring injury.'" Williams, 77 F.3d at 762. For that reason, the Fourth Circuit noted that "courts should be wary of finding uses of force that inflict 'merely' pain but not injury to be de minimis, and therefore beyond requiring justification under the Eighth Amendment." Id. at n.2.

In this case, Jackson testified during his deposition that he was subjected to repeated incidents of torture and abuse by Fletcher, which included, inter alia, unprovoked blows to his body, and the misuse of Freon, firecrackers, lit cigarettes, a shocking device, flammable liquids, and ammonia. Such allegations, which must be accepted as true at this stage of the proceedings, clearly describe conduct that a reasonable jury could find "repugnant to the conscience of mankind," regardless of whether Jackson suffered any severe or disabling injuries from Fletcher's actions. Because Norman clearly indicated that force "of a sort 'repugnant to the conscience of mankind' [would fall] expressly outside the de minimis force exception" and, thus, give rise to an actionable Eighth Amendment claim, the court concludes that Jackson is not entitled to qualified immunity with respect to the claims arising from the incidents described in paragraphs 12(a), 12(b), 12(e), 12(g), 12(h), 12(m), 12(n), 12(o), 12(q), and 12(r) of the second

amended complaint. Norman, 25 F.3d at 1263, n.4; see also McKinney v. Johnson, 2010 U.S. Dist. LEXIS 91555, at *12-13 (D. S.C. Sept. 2, 2010) (rejecting the defendant's argument that the de minimis injury doctrine, "which was good law at the time of the alleged conduct . . . , should allow her the protection of qualified immunity").[4]

## B.  Due Process Claim

Count One of Jackson's second amended complaint also includes a claim that Fletcher's conduct resulted in the "denial of plaintiff's liberty interest under the Fourteenth Amendment to the Constitution of the United States." (2d Am. Compl. at para. 30).  Although it is not entirely clear from the second amended complaint or Jackson's more recent pleadings, the due process claim appears to be based on Jackson's one-time placement in "the hole."[5]  That incident, however, does not give rise to a viable due process claim.

"In order to prevail on a . . . due process claim, inmates must first demonstrate that they were deprived of 'life, liberty, or property' by governmental action." Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997).  In Sandin v. Conner, 515 U.S. 472 (1995), the United States Supreme Court held that "segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." Sandin, 515 U.S. at 486. The Fourth Circuit has likewise held that "changes in a prisoner's location, variations of daily

---

[4] As the district court noted in McKinney, even if Jackson's injuries could be classified as de minimis, Fletcher had no way of knowing that they would be at the time of the incidents at issue, and "nothing about a post-hoc assessment of a plaintiff's degree of injury, informed as it is by the resilience of the victim and divorced in many ways from the conduct in question, bears on whether a defendant had prospective notice that [his] conduct violates a clearly established constitutional right." McKinney, 2010 U.S. Dist. LEXIS 91555, at *13.

[5] Jackson makes no mention of his due process claim in his response to Fletcher's motion for summary judgment.

routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and] are contemplated by his original sentence to prison . . . ." Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991).

In this case, there is no evidence that the conditions to which Jackson was subjected during his seven-hour stint in segregation were dramatically different than the conditions in the general population or that they imposed any particular hardship. Although his room in the segregation unit may have been small, Jackson testified during his deposition that he had access to a bed and a toilet, and that he received the same meals that he would have been given if he had been housed in the general population. For these reasons, Jackson has no actionable due process claim arising from his placement in segregation and, thus, Fletcher is entitled to summary judgment with respect to this claim.

## II.    Claims under state law

In addition to his claims under § 1983, Jackson's complaint also asserts supplemental state law claims of assault, battery, and intentional infliction of emotional distress. In moving for summary judgment with respect to these claims, Fletcher argues that all of the state law claims are barred by Virginia Code § 8.01-243.2, that many of Jackson's claims of assault and battery must be dismissed on the merits, and that Jackson's claim of intentional infliction of emotional distress should be dismissed altogether. The court will address each of these arguments in turn.

### A.    The application of Virginia Code § 8.01-243.2

Section § 8.01-243.2 of the Virginia Code imposes limitations on personal actions relating to an inmate's conditions of confinement. The statute provides, in its entirety, as follows:

17

> No person confined in a state or local correctional facility shall bring or
> have brought on his behalf any personal action relating to the conditions of
> confinement until all available administrative remedies are exhausted.
> Such action shall be brought by or on behalf of such person within one
> year after cause of action accrues or within six months after all
> administrative remedies are exhausted, whichever occurs later.

Va. Code § 8.01-243.2. Emphasizing that Jackson did not exhaust his administrative remedies and that the instant action was filed approximately 20 months after Fletcher left Camp 25, Fletcher contends that Jackson's state law claims are barred by the exhaustion requirement and the limitations period set forth in the statute. For the following reasons, however, the court concludes that § 8.01-243.2 is not applicable to the instant action, since Jackson had been released and, thus, was no longer confined at the time the action was filed.

The statutory language is plain and unambiguous; it applies to "person[s] confined in a state or local correctional facility." Va. Code § 8.01-243.2. In light of the statute's plain language, the court agrees with Jackson that it is the plaintiff's status at the time he files suit that determines whether the statute applies. Therefore, a plaintiff who seeks to bring an action regarding his conditions of confinement after he has been released is no longer "confined" and does not have to satisfy the statute's requirements before bringing suit. Since Jackson was not incarcerated at the time he filed the instant action, the court concludes that he is not subject to the requirements set forth in § 8.01-243.2.[6]

---

[6] The court notes that its decision is consistent with case law interpreting a similar exhaustion requirement set forth in the Prison Litigation Reform Act ("PLRA"). The PLRA requires that a prisoner exhaust administrative remedies before filing any action under federal law with respect to confinement. See 42 U.S.C. § 1997e(a). The PLRA defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). Consistent with its sister circuits, the Fourth Circuit has held that "[a] former inmate who has been released is no longer 'incarcerated' or 'detained' for purposes of § 1997e(h) and therefore does not qualify as a 'prisoner' subject to the PLRA." Cofield v. Bowser, 247 F. App'x 413, 414 (4th Cir. 2007). Thus a "plaintiff who brings [a federal action] regarding prison conditions after his release does not have to satisfy the PLRA's exhaustion requirement." Id.

## B.     Assault and battery

In Koffman v. Garnett, 574 S.E.2d 258 (Va. 2003), the Virginia Supreme Court defined

the elements of the "independent torts" of assault and battery. Koffman, 574 S.E.2d at 261. The

Court explained that the "tort of assault consists of an act intended to cause either harmful or

offensive contact with another person or apprehension of such contact, and that creates in that

person's mind a reasonable apprehension of an imminent battery." Id. The Court defined the tort

of battery as "an unwanted touching which is neither consented to, excused, nor justified." Id.

The Court explained that the torts "go together like ham and eggs," and that "the difference

between them is that between physical contact and the mere apprehension of it." Id. (internal

citation and quotation marks). While the tort of battery requires some form of physical contact,

"it is abundantly clear that a perpetrator need not inflict a physical injury to commit a battery."

Adams v. Commonwealth, 534 S.E.2d 347, 351 (Va. Ct. App. 2000). Moreover, the Court of

Appeals of Virginia has held that contact with an intangible substance may give rise to a battery

claim. See Id.

Applying the foregoing principles, Fletcher's motion for summary judgment will be

granted in part and denied in part with respect to Count Two. Specifically, the court concludes

that Fletcher is entitled to summary judgment on the claims for assault and/or battery arising

from the incidents identified in paragraphs 12(c), 12(d), 12(f), 12(i), 12(k), 12(l), 12(p), 12(t),

and 12(u) of the amended complaint.[7] However, the motion for summary judgment will be

denied with respect to the incidents identified in paragraphs 12(a), 12(b), 12(e), 12(g), 12(h),

12(j), 12(m), 12 (n), 12(o), 12(q), 12(r), and 12(s). Accepting Jackson's testimony regarding

those incidents, a reasonable jury could find that Jackson was subjected to an unwanted touching

---

[7] As previously explained, Jackson's claims arising from the pepper juice incident described in paragraph 12(f) of the second amended complaint are time-barred.

by Fletcher, and/or that Fletcher engaged in conduct intended to place Jackson in apprehension of bodily harm. See Koffman, 574 S.E.2d at 261.

### C. Intentional infliction of emotional distress

Fletcher's final claim is one for intentional infliction of emotional distress. Such claims are not favored in Virginia. See Harris v. Kreutzer, 624 S.E.2d 24, 33 (Va. 2006). The Supreme Court of Virginia has held that a plaintiff cannot recover on a claim of intentional infliction of emotional distress unless he can show by clear and convincing evidence that "1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." SuperValu, Inc. v. Johnson, 666 S.E.2d 335, 343 (Va. 2008).

Assuming, without deciding, that a reasonable jury could find that Jackson satisfied the first three elements, the court concludes that Jackson's claim for intentional infliction of emotional distress is insufficient to withstand summary judgment, since he has failed to proffer sufficient evidence that he has suffered the degree of emotional distress required to meet the fourth element. With respect to that element, the Virginia Supreme Court has emphasized that "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." Russo v. White, 400 S.E.2d 160, 163 (Va. 1991).

In Russo, the Supreme Court held that a plaintiff complaining of nervousness, sleep deprivation, stress and its physical symptoms, withdrawal from activities, and an inability to concentrate at work, failed to allege the type of extreme emotional distress that gives rise to liability. Id. Applying Russo in Harris v. Kreutzer, the Supreme Court similarly held that the

plaintiff's allegations of "severe psychological trauma and mental anguish affecting her mental and physical well-being," with symptoms including "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling," were "insufficient to satisfy the fourth element" of the test for intentional infliction of emotional distress. Harris, 624 S.E.2d at 34.

In the later case of Almy v. Grisham, 639 S.E.2d 182 (Va. 2007), the Virginia Supreme Court found that the plaintiff had adequately alleged severe emotional distress where she asserted that the defendants' conduct "caused her to suffer from several debilitating conditions, including depression, nervousness, and an inability to sleep, which ultimately caused a complete disintegration of virtually every aspect of her life." Almy, 639 S.E.2d at 188. In distinguishing cases such as Russo and Harris, the Court noted that "[w]hile both Almy and the plaintiff in Harris alleged that they required counseling and suffered from severe psychological trauma, depression, humiliation and injury to reputation, Almy additionally alleged that the defendants' actions rendered her functionally incapable of carrying out any of her work or family responsibilities." Id.

Here, the court is convinced that the foregoing cases compel the conclusion that Jackson cannot establish by clear and convincing evidence that he has suffered the degree of emotional distress required to succeed on this claim. To meet this stringent test, Jackson cites to the fact that he was treated for anxiety and depression in January of 2010, two years after Fletcher left Camp 25. According to the records from Carilion Alleghany Regional Hospital, dated January 10, 2010, and the records from Alleghany Highlands Community Services, dated January 11 and 12, 2010, Jackson reported being depressed and anxious for several reasons, including the breakup of his marriage, the death of his father, and his pending lawsuit against Fletcher.

Jackson does not dispute that he received no other treatment for anxiety or depression during the two-year period following the incidents at issue in this case,[8] and the court is convinced that the evidence proffered by Jackson would not allow a reasonable jury to find that he experienced emotional distress "so severe that no reasonable person could be expected to endure it." Russo, 400 S.E.2d at 163; see also See Ware v. James City County, 652 F. Supp. 2d 693, 715 (E.D. Va. 2009) (granting summary judgment to the defendant where the plaintiff "had only had one visit with a medical professional about whom he cannot provide any further details"). Accordingly, the court will grant Fletcher's motion for summary judgment with respect to this claim.

## Conclusion

For the reasons stated, Fletcher's motion for summary judgment will be granted in part and denied in part, and the case will proceed to trial. The Clerk is directed to send certified

---

[8] During his deposition, Jackson testified as follows:

Q.    All right [sic]. Let's go on to Alleghany County Regional Hospital. Did you ever go to Alleghany County Regional Hospital for any injuries inflicted upon you by Mr. Fletcher?

A.    No, sir.

. . .

Q.    Alleghany Highlands Community Services, Clifton Forge Counseling . . . . Now, have you been there since Camp 25?

A.    Yes, when – when I found out I had to come to court and be around Mr. Fletcher, I got all to hell. I didn't want to be around him.

Q.    What's the name of the doctor you see [sic] out there?

A.    I don't know who it was. Some woman.

Q.    Some woman. How many times have you seen her?

A.    I just went in there once.

(Jackson Dep. at 60-61).

copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 18ᵈ of January, 2011.

_____
Chief United States District Judge